UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. 15-cr-00028(01) and (02)

VERSUS                            JUDGE FOOTE

RICARDO GARCIA (01)               MAGISTRATE JUDGE HORNSBY
JESUS CHRISTIAN MARTINEZ (02)

## REPORT & RECOMMENDATION

**Introduction**

Defendants Ricardo Garcia ("Garcia") and Jesus Christian Martinez ("Martinez") are charged with conspiracy to possess with intent to distribute powder cocaine and possession with intent to distribute powder cocaine. Doc. 21. The charges arise out of a traffic stop that occurred on Interstate 20 just east of Bossier City, Louisiana. During a search, Louisiana State Police Troopers found approximately 31.5 kilograms of powder cocaine hidden inside an aftermarket speaker box.

Before the court are Defendants' **Motions to Suppress. Docs. 40 and 42**. Defendants argue that there was no probable cause to initiate the traffic stop; one of the traffic laws at issue is unconstitutionally vague; Defendants' prolonged detention was not supported by reasonable suspicion; and Garcia's oral and written consent to search was invalid due to Defendants' prolonged detention and a statement by one of the troopers regarding the possible use of a canine. Defendants also challenged the voluntariness of their statements, but they withdrew that argument at the suppression hearing. The issues

addressed herein are the issues discussed at the hearing and in the parties' supplemental briefs. For the reasons that follow, the motions to suppress should be **denied**.

**Facts**

An evidentiary hearing was held on June 23, 2015. Doc. 49. The evidence at the hearing establishes the following facts. LSP Trooper George Strickland, a member of the Criminal Patrol Unit, was parked in the median of I-20. Trooper Strickland saw a tractor-trailer (18-wheeler) headed east in the right lane. A white Buick was following the truck at an unsafe distance. Trooper Strickland estimated that the car was only about one and a half vehicle lengths behind the truck.

Once the vehicles passed, Trooper Strickland headed east on I-20 to observe the Buick. He saw the truck change to the left lane to pass another commercial vehicle. The Buick then drifted across the center lane as if it was also going to change lanes. However, the turn signal was never activated, and the Buick drifted across the center line then back to the right towards the fog line. According to Strickland:

> Well, I mean, especially that time of the morning – and I had noticed that it was, in that case, it was a North Carolina license plate. And if you have people that have been traveling all night, on the road for a long time, we have a lot of sleepy drivers. Especially in the mornings, you know, people fall asleep and crash out into the median or the right-of-ways. Or it could be an impaired driver. Just depends. Tr. 57.

Strickland activated his emergency lights to initiate a traffic stop. His dash camera and audio recorder were activated automatically. Government Ex. 12 (audio and video of traffic stop).

Trooper Strickland testified that following too closely is one of the main causes of accidents on the interstate. Tr. 6. It is especially dangerous when following behind a large truck that is being driven 70 miles per hour. Tr. 6-7.

Trooper Strickland approached the driver, Garcia, and asked him to step to the rear of the Buick. Garcia produced a Texas driver's license. Tr. 8. Strickland called the license plate in to dispatch at Troop G, and he also ran the license plate on his mobile data terminal. Strickland learned that the car was registered out of North Carolina to a female with a different last name. Tr. 9.

Strickland noticed that Garcia's driver's license contained a home address in Brownsville, Texas. Strickland asked Garcia if they were traveling out of Brownsville. Garcia stated that they were traveling out of Austin and were driving to North Carolina for work. Garcia said that he and Martinez were on a two-week vacation during which they went to visit family and watch the Super Bowl. Tr. 10. Garcia, an American citizen, had no difficulty communicating with Trooper Strickland.

Trooper Strickland then approached the passenger, Martinez, also an American citizen. Martinez stated that he and Garcia were traveling from Brownsville and had been gone for about two months. Tr. 11. During their conversation, Trooper Strickland noticed that Martinez was particularly nervous. Martinez constantly broke eye contact and kept rubbing his hands on his pants leg in a very nervous fashion. Tr. 11. Trooper Strickland then

returned to his patrol car to run Garcia's and Martinez's licenses. Other than an arrest of one of the Defendants for domestic violence, they had clean records.

Because of his observations, Trooper Strickland suspected that Garcia and Martinez were involved in some type of criminal activity, so he called for his backup, Trooper Roger Cason. Tr. 13-14. Cason was the canine trooper on duty. Strickland testified that he requested backup for several reasons. First, neither the driver nor the passenger was the registered owner of the vehicle. Second, Garcia and Martinez gave conflicting stories about their itinerary. Garcia said they were coming from Austin, but Martinez said that they were coming from Brownsville. Garcia said they had been gone for two weeks, but Martinez said they had been gone for two months. Third, Martinez appeared unusually nervous even when questioned about routine matters. Finally, Strickland knew from his training and experience that Brownsville, Texas is on the border of Mexico and is known as a source city for controlled substances.

After calling for backup, Strickland returned the driver's licenses to Defendants. This occurred about 12 minutes after the stop began. Tr. 14. He explained to Garcia that he would receive only a verbal warning for two traffic violations. After the warning, Strickland asked Garcia for consent to search the vehicle. Strickland advised Garcia that he had the right to refuse consent, but if he refused, Strickland had a right to run a canine around the vehicle. Tr. 38. Garcia stated: "Yes, sir, boss man." Tr. 14. Strickland also presented

Garcia with a LSP consent to search form. Government Exhibit 2. The consent is written in both English and Spanish. Garcia readily signed the English version. Tr. 15.

Trooper Cason, who had arrived at the scene within three or four minutes (Tr. 73) of the request for backup, stayed in his patrol car until he saw Garcia sign the consent to search form. Tr. 16. Cason then got out of his car and patted Garcia down for weapons, while Strickland asked Martinez to exit the vehicle. Strickland began his search of the vehicle while Cason stood in front of Strickland's patrol car occasionally talking to Defendants.

Trooper Strickland found a bill of sale and registration for the vehicle in the glove compartment. Tr. 17. The registration showed that the vehicle was registered to Maria Villegas. Tr. 18-19. Government Exs. 3 and 4. The bill of sale showed that Ms. Villegas recently sold the vehicle to Jose Castro. Tr. 17.

Trooper Strickland also searched the engine compartment. He noticed that the vehicle (inside and out) was very clean, but the engine had evidence of mud splatter. Drug smugglers sometimes use spray-on mud to cover up recent tool marks or other work that they have done on a vehicle. Tr. 22.

During Strickland's search of the passenger compartment, he activated the trunk release latch, and the trunk opened. Cason, who was standing right behind the vehicle, saw a large speaker box inside the trunk. Cason approached Strickland and told him about the speaker box.

The speaker box was particularly unusual to Trooper Strickland, because the car still had a factory stereo. Tr. 20. It was his opinion that when a person upgrades their car with nice speakers and amps, they usually buy a better stereo to go with it. Tr. 21. Trooper Cason, who has a set of those same speakers (Kicker Competition Speakers) in his personal vehicle, echoed that sentiment at the evidentiary hearing. Tr. 65

Strickland noticed that the speaker box contained a port or opening to allow air to pass through. The opening was narrow, but Strickland was able to see inside. He saw something purple that did not appear to be part of the speaker unit. Tr. 22. Strickland reached his hand inside the speaker box and felt a hard, brick-shaped package, with his fingertips. Tr. 23. Strickland recognized the package as likely illegal narcotics, and he instructed Trooper Cason to detain Garcia and Martinez. Tr. 23-24, 67.

The Buick was driven to Troop G Headquarters, where a more thorough search of the speaker box took place. The troopers discovered 28 packages containing approximately 31.5 kilos of powder cocaine. Both defendants were read their <u>Miranda</u> rights, but neither made any incriminating statements.

**Law and Analysis**

    **Garcia's Standing**

The Government acknowledges that Garcia (the passenger) can challenge the traffic stop, but it argues that Garcia lacks standing to complain about the search of the vehicle. The Government is correct.

In order to claim the Fourth Amendment's protection, a defendant must have "a legitimate expectation of privacy in the invaded place." United States v. Iraheta, 764 F.3d 455, 461 (5th Cir. 2014); United States v. Hernandez, 647 F.3d 216, 219 (5th Cir. 2011). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 130 n. 1(1978). A defendant's "expectation must be 'personal[ ]' and 'reasonable,' and it must have a 'source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Hernandez at 219. In other words, a defendant's standing "depends on 1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and 2) whether that expectation of privacy is one which society would recognize as [objectively] reasonable." United States v. Kye Soo Lee, 898 F.2d 1034, 1037–38 (5th Cir. 1990). "Standing does not require an ownership interest in the invaded area...." Hernandez, at 219.

The Fifth Circuit has recognized that "passengers who assert[ ] neither a property nor a possessory interest in the automobile that was searched, nor any interest in the seized property, ha[ve] no legitimate expectation of privacy entitling them to the protection of the [F]ourth [A]mendment." Iraheta, 764 F.3d at 461 (5th Cir. 2014); United States v. Greer, 939 F.2d 1076, 1093 (5th Cir.1991). Garcia does not assert any interest in the car or the drugs, so he cannot challenge the search of Martinez's car. However, the court finds that

Garcia can challenge the constitutionality of the traffic stop. United States v. Martinez Alvarez, No. 2012 WL 4863212, at *2 (M.D. La. Oct. 12, 2012).

**The Traffic Stop**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, *4 (5th Cir. 2014); United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). "Reasonable suspicion" analysis requires assessing the totality of the circumstances to ascertain the reasonableness of the suspicion. United States v. Powell, 732 F.3d 361, 369 (5th Cir. 2013). This is consistent with the "touchstone of Fourth Amendment analysis [being] reasonableness," which "requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

The Supreme Court held unanimously in Whren v. United States, 517 U.S. 806 (1996): "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at 810. "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." United States v. Zavala, 541 F.3d 562, 575 (5th Cir.2008). Therefore, probable cause to make a traffic stop exists when a defendant commits a traffic violation and a law-enforcement officer observes the violation. United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir. 2007).

"The rule established by the Supreme Court in Whren allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop," United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006). On the other hand, the legal justification for the traffic stop must be "objectively grounded." Id.

Terry's first prong is easily met in this case. Trooper Strickland's testimony was credible that he saw Garcia's vehicle following too closely behind the large truck. He also saw Garcia's vehicle cross the center line without signaling and then drift back over across the right fog line. Thus, Trooper Strickland had probable cause to believe that Garcia had committed two separate traffic violations and was either intoxicated or sleepy.

Terry's second prong asks whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. An officer's subsequent actions are not

reasonably related in scope to the circumstances that caused the officer to stop the vehicle if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. Rodriguez v. United States, 135 S.Ct. 1609, 1614 (2015); Brigham at 506. Rodriguez explained that, once the tasks tied to the traffic infraction are, or reasonably should be, completed, the authority for the seizure ends unless the Government can show an exception to the Fourth Amendment that allows the stop to continue. Id. One exception is that, if the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, No. 2014 WL 7404535, at *3 (N.D. Tex. Dec. 30, 2014).

An officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id; Rodriguez, at 1614. Additionally, an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. Pack, supra. The reasoning behind

this rule is that the Fourth Amendment protects against detention, not questioning. Id. Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. Id.

Trooper Strickland acted promptly and professionally in investigating the reasonable suspicion that arose during the stop. Defendants were traveling in a vehicle that was registered in the name of another person who did not share either of their last names. Garcia said they were traveling out of Austin and had been absent from North Carolina for two weeks. Martinez stated that they were traveling from Brownsville (a source city for drugs that is about 350 miles from Austin), and they had been gone for about two months. Martinez was very nervous. He broke eye contact frequently, and he continuously rubbed his palms on the thigh area of his pants.

The totality of these factors – especially the conflicting stories – support Trooper Strickland's reasonable suspicion of additional criminal activity. As the Fifth Circuit stated in United States v. Pena-Gonzalez, 2015 WL 4317820, *4 (5th Cir. 2015), the question is not whether the conflicting stories were convincing proof that Defendants were lying, it is whether it was reasonable for Trooper Strickland to view Defendants' statements as suspicious. Those suspicions were reasonable, so the continued detention of Defendants for an additional minute or so in order to ask for consent to search was constitutional. Id. at *5.

**Constitutionality of the Traffic Law**

Trooper Strickland initiated the traffic stop because (1) Garcia was following too closely behind the large truck in violation of La. R.S. 32:81, and (2) Garcia drifted left across the center line then back over the fog line in violation of La. R.S. 32:79. Section 81 prohibits a driver from following another vehicle "more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." Section 79 requires that a vehicle be driven "as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

Defendants argue, without citation to any authority, that Section 81 is unconstitutionally vague. The Fifth Circuit employs a two-part void-for-vagueness. First, the law may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; or second, the law may authorize and even encourage arbitrary and discriminatory enforcement. United States v. Escalante, 239 F.3d 678, 680 (5th Cir. 2001).

Section 81 does not violate either test. A person of ordinary intelligence should know that following one and a half vehicles behind a big truck at 70 mph is too close to be safe. Although the statute is broadly worded, it does not encourage the police to stop drivers on a whim. It is no more vague than the careless driving statute at issue in Escalante, which affirmed the denial of a motion to suppress based on a traffic stop.

**Consent to Search**

To determine whether Garcia's consent to the search was voluntary, this court must consider (1) the voluntariness of his custodial status; (2) the presence of coercive police procedures; (3) the extent and level of Garcia's cooperation with the police; (4) his awareness of his right to refuse consent; (5) Garcia's education and intelligence; and (6) his belief that no incriminating evidence would be found. United States v. Jones, 234 F.3d 234, 242 (5th Cir. 2000). The court must consider all of these factors, and no one factor is determinative. Id. The Government bears the burden of proving consent was voluntary. Id.

Factor 1: Garcia was not in custody at the time he gave oral and written consent. He was not handcuffed or restrained. Garcia was never told he was free to leave, but his driver's license had been returned to him. The very minimal detention that led up to the request for consent was no more than what any motorist experiences while being issued a traffic citation or warning. Aguilera, supra.

Factor 2: Trooper Strickland was respectful to Garcia and did not use any deceptive or coercive tactics to obtain consent to search.

Factor 3: Garcia was very cooperative and did not demonstrate reluctance, hostility, or fear.

Factor 4: Trooper Strickland told Garcia that he had the right to not consent to a search. Strickland added that if Garcia did not consent, Strickland had a right to run a canine. That statement did not materially affect the voluntariness of Garcia's consent. Garcia was

faced with the possibility of a canine sniffing the air around his vehicle, and he likely made a calculated decision to take his chances with Trooper Strickland. The drugs were well hidden, and Trooper Strickland might not find them. But if a canine sniffed the vehicle, the canine might alert. See, e.g., United States v. Wolfe, 2009 WL 330214 (N.D. Tex. 2009)(consent to search vehicle may have been initially influenced by the trooper's statement that a K-9 would be called, but consent was not a product of coercion or given as a result of threats by the trooper; defendant likely believed the trooper would not find the concealed drugs, a less certain prospect than if a drug dog were called to the scene). Furthermore, after giving oral consent, Garcia was presented with a written consent form in both Spanish and English. That form again advised Garcia of his right not to consent and his right to revoke his consent at any time. Garcia signed the English version of the form. The prospect of having a dog sniff the car would not and did not prolong the detention; Trooper Cason was present with the dog before Garcia gave consent.

      Factor 5: Garcia appeared intelligent and coherent throughout the video. Nothing suggests that he was mentally impaired or handicapped.

      Factor 6: The drugs were well hidden inside of the speaker box.

      After considering all of the factors, and following a careful review of the video and audio of the stop, the undersigned finds that Garcia's oral and written consent to search were given freely and voluntarily.

**Conclusion and Recommendation**

The traffic stop and subsequent search did not violate the constitutional rights of either Garcia or Martinez. The motions to suppress (Docs. 40 and 42) should be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

Shreveport, Louisiana, this 23rd day of September, 2015.

Mark L. Hornsby
U.S. Magistrate Judge